**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Hope A. Charron</u>

     **v.**

                                           Civil No. 13-cv-36-PB
                                         Opinion No. 2013 DNH 156

<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>

<u>**MEMORANDUM AND ORDER**</u>

Hope Charron seeks judicial review of a ruling by the
Commissioner of the Social Security Administration ("SSA")
denying her application for Supplemental Security Income
benefits ("SSI").  Charron claims that the Administrative Law
Judge ("ALJ") lacked substantial evidence to support his finding
that she was not disabled.  Charron also claims that the ALJ
made a residual functional capacity ("RFC") determination that
failed to account for all of her non-exertional limitations and
misapplied the Medical-Vocational Guidelines as a framework for
her decision.

For the reasons set forth below, I remand the case for
further proceedings before the Commissioner.

# I.   BACKGROUND[1]

## A.   Procedural History

Charron applied for SSI on July 6, 2010, claiming that she began suffering from the following impairments on July 6, 2009: depression; attention deficit hyperactivity disorder (ADHD); knee-related problems; grand mal seizures; and diabetes.  The SSA denied Charron's claim on December 8, 2010.  Tr. at 92. Charron then supplemented the record with new medical evidence purportedly documenting a vision impairment.  Charron requested a hearing before an ALJ, which was held on November 22, 2011.  A vocational expert ("VE") testified.

On December 30, 2011, the ALJ issued a decision finding that Charron was not disabled on or after her alleged disability onset date.  The Appeals Council denied Charron's request for review on November 29, 2012.  Accordingly, the ALJ's decision is the final decision of the Commissioner.

---

[1] The background facts are presented in the parties' Joint Statement of Material Facts (Doc. No. 12) and are summarized here.  I also rely on the Administrative Transcript (Doc. No. 7), citations to which are indicated by "Tr."

**B.     Relevant Medical History**[2]

Between early 2009 and late 2011, Charron made numerous visits to a variety of healthcare providers to receive treatment for ailments unrelated to her eyes.  These providers, who were not vision specialists, consistently noted normal vision in the "review of systems" portion of their treatment notes.  Representative comments are as follows: "no acute changes in vision," Tr. at 835; "fundi benign, conjunctiva and sclera clear,"[3] id. at 1028; "[d]enies vision loss," id. at 1055; "[n]o blurry/double vision," id. at 1216; "conjugate gaze," id. at 1250; "[p]upils are equal, round and reactive to light and accommodation.  Extraocular movements intact.  Visual acuity intact," id. at 1278; and "no icterus,[4] vision grossly normal," id. at 1357.  In contrast, on December 7, 2010, orthopedic

---

[2] Because the ALJ's treatment of Charron's alleged vision impairment requires remand, I limit my discussion to Charron's vision-related medical history.

[3] The fundus is "the portion of the interior of the eyeball around the posterior pole . . . ."  Stedman's Medical Dictionary 777 (28th ed. 2006).  The conjunctiva is the "mucous membrane investing the anterior surface of the eyeball and the posterior surface of the lids."  Id. at 431.  The sclera is a "portion of the fibrous layer forming the outer envelope of the eyeball . . . ."  Id. at 1732.

[4] Icterus is the medical term for jaundice, which causes a "yellowish staining of the . . . sclerae . . . ."  Id. at 943, 1010.

surgeon Dr. Douglas J. Moran noted, without further explanation,
that Charron was "[b]lind in her left eye" during his review of
systems.  Id. at 599.  Additionally, an emergency room doctor
treating Charron for low back pain on September 7, 2011 noted
that her "[l]eft eye [is] injected[5] with no other abnormalities."
Id. at 1218.  Other providers treating Charron in subsequent
weeks, however, noted that there was "no injection."  Id. at
1357, 1370, 1384.  Based on a review of Charron's medical
records on December 6, 2010, state agency physician Dr. John
Sadler reported that Charron had no visual limitations.  He also
noted that she could cook for her children, perform household
chores, and use public transportation.  Id. at 82, 85.

On January 11, 2011, Dr. Timothy J. Hogan, O.D. examined
Charron.  Id. at 890.  Dr. Hogan's treatment notes from this
visit are the only documentation of a detailed eye examination
in the record.  Charron complained of blurry vision in her left
eye and "a decrease in all ranges with and without" prescription
over the course of the previous year.  Id.  Charron reported
that her last eye examination occurred three to four years
earlier, that she had undergone three surgical procedures to her

---

[5] In this context, injected denotes "visible blood vessels
distended with blood."  Id. at 978.

left eye as a young child, and that she subsequently wore a
patch over her right eye periodically from age three until her
early teens.[6]  Id.  Dr. Hogan noted that these prior surgical
procedures were "[m]ost likley [sic] strab[ismus] surgery . . .
."[7]  Id.  His examination revealed bilateral dry eye syndrome, a
tilted optic disc in the left eye, anisometropia, astigmatism,
divergent and vertical misalignment in the extraocular muscles,
and corrected left eye acuity of 20/25.[8]  Dr. Hogan recommended
use of warm compresses several times a day to treat Charron's
dry eye syndrome, monitoring of Charron's tilted optic disc,
full-time use of Charron's prescription eyeglasses, and a return
visit in one year for further evaluation.  Id.

---

[6] Charron was 35 years old at the time she filed her SSI
application and 36 years old at the time of this examination.

[7] Strabismus is a "manifest lack of parallelism of the visual
axes of the eyes."  Id. at 841.

[8] Dry eye syndrome, also known as keratoconjunctivitis sicca, is
inflammation of the conjunctiva and of the cornea associated
with decreased tears.  Id. at 1024.  The optic disc is "an oval
area of the ocular fundus [the portion of the interior of the
eyeball around the posterior pole] devoid of light receptors . .
. ."  Id. at 549, 777.  Anisometropia is a "difference in the
refractive power of the two eyes."  Id. at 95.  Astigmatism is a
"condition of unequal curvatures along the different meridians
in one or more of the refractive surfaces . . . of the eye . . .
."  Id. at 170.

Nine months later, Dr. Hogan completed a vision questionnaire.  Id. at 1089.  Noting that he had seen Charron only once before, he reiterated his diagnoses of dry eye syndrome, astigmatism, and a corrected visual acuity of 20/25 in the left eye, while adding a diagnosis of amblyopia[9] in the left eye, which he noted was "most likely stable."  Id.  Dr. Hogan reported that Charron "notes blurry vision [in her] left eye. This however is due to congenital formation of [the] optic nerve resulting in a form of amblyopia (lazy eye) with best corrected vision of 20/25."  Id.  He opined that Charron could perform work activities requiring color vision on a constant basis; near and far acuity, accommodation, and field of vision on a frequent basis; and depth perception on a rare basis.  He noted that work involving prolonged driving or "fine near work" might pose some difficulties for Charron.

**C.   Administrative Hearing - June 13, 2011**

    1.   Charron's Testimony

    Charron testified that she has significant visual limitations, particularly in her left eye, because her eyes "focus in different directions or point in different

---

[9] Amblyopia denotes "[p]oor vision caused by abnormal development of visual areas of the brain in response to abnormal visual stimulation during early development."  Id. at 58.

directions."  Tr. at 46.  She noted that she could look at a television or computer screen for five to ten minutes before her vision became blurry.  Id.  She also testified to lifelong problems with her left eye that had recently worsened.

    2.  <u>Vocational Expert Testimony</u>

The ALJ asked the VE to testify to the vocational abilities of a hypothetical individual with the same age, education, and relevant work experience as Charron.  In response to a hypothetical containing all of the limitations in the ALJ's ultimate RFC assessment, the VE testified that this hypothetical individual could perform the following jobs existing in significant numbers in the national economy: (1) addresser; (2) fast food worker; (3) housekeeper/cleaner; (4) charge account clerk; and (5) small product assembler.

The ALJ then posed a second hypothetical question to the VE including all of the first hypothetical's limitations, plus an additional requirement that the individual would have to avoid performing tasks requiring depth perception.  The VE testified that the hypothetical individual would then be unable to perform any jobs.[10]  Id. at 68, 70.

---

[10] The precise exchange between the ALJ and VE is as follows:

    [ALJ]: So basically it [a depth perception limitation]

D.   **The ALJ's Decision**

In his decision dated December 30, 2011, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a)(4) to determine whether an individual is disabled.  At step one, the ALJ found that Charron had not engaged in substantial gainful activity since July 6, 2010, the date she filed her application for SSI.  At step two, the ALJ noted that Charron had the following severe impairments: affective disorder; obesity; left knee impairment; and a history of seizures.  In the explanation of her step two determination, the ALJ noted that "[a]lthough the medical evidence in the record clearly establishes that the claimant suffers from amblyopia and astigmatism, there is no substantial medical evidence in the record that the claimant has limitations because of it."  Tr. at 15 (citation omitted).  The ALJ continued:

> The claimant maintains binocular vision, including 20/20 visual acuity in her right eye and 20/25 visual acuity in her left.  The claimant had a driver's license, which she only lost because of her history of seizures and not because of a vision problem.  The claimant also worked in 1998, earning $12,783 even with her vision impairment, which an examining medical

eliminates all –
[VE]: Honestly I think so.
[ALJ]: Okay, if that's your testimony that's fine.
[VE]: That's my testimony.

Tr. at 68.

> source described as "congenital" in nature. The
> claimant having previously worked with her vision
> impairment strongly suggests that she could work today
> even with it. Further, the claimant watches
> television, including news programs and soap operas,
> and she uses the computer, e-mailing and communicating
> via Skype. There being no substantial evidence in the
> record indicating the claimant's limitations from
> these impairments, I find that they do not create more
> than a minimal reduction in the ability of the
> claimant to perform work related activities;
> therefore, they are not severe.

Id. (citations omitted). This discussion is the only reference

to Charron's claimed vision impairment in the ALJ's decision.

At step three, the ALJ concluded that Charron did not have an

impairment or combination of impairments that met or medically

equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. At step four, the ALJ found that Charron

retained the Residual Functional Capacity ("RFC") to perform

light work per 20 C.F.R. § 416.967(b), subject to a number of

specific limitations – but no visual limitations - that

precluded Charron from performing any of her past relevant work.

At step five, the ALJ relied on the VE's testimony, which she

found to be "reliable, credible and convincing," to determine

that Charron could perform jobs existing in significant numbers

in the national economy. Tr. at 25. The ALJ thus concluded

that Charron had not been disabled at any point since July 6,

2010, the date she filed her application.

## II. __STANDARD OF REVIEW__

Under 42 U.S.C. § 405(g), I must review the pleadings and
the administrative record and enter a judgment affirming,
modifying, or reversing the final decision of the Commissioner.
My review "is limited to determining whether the ALJ used the
proper legal standards and found facts [based] upon the proper
quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).

The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence in the
record. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955
F.2d 765, 769 (1st Cir. 1991) (per curiam) (citing Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981)). It is the role of the ALJ, not the court, to resolve
conflicts in the evidence. Id. The ALJ's findings of fact are
accorded deference as long as they are supported by substantial
evidence. Id. Substantial evidence to support factual findings
exists "if a reasonable mind, reviewing the evidence in the
record as a whole, could accept it as adequate to support his
conclusion." Id. (quoting Rodriguez, 647 F.2d at 222). If the
substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a

10

different conclusion." Id. at 770 (citing Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Irlanda Ortiz, 955 F.2d at 769; Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)).

### III.  ANALYSIS

Charron moves for reversal and remand on two main grounds. She argues that the ALJ (1) ignored the limiting effects of her vision impairment when developing her RFC, and (2) misapplied the Medical-Vocational Guidelines by improperly using them as a framework for her decision.  I need not consider Charron's second argument because I find that her first argument has merit and requires remand.

### A.  The ALJ Ignored Medical Evidence Regarding Charron's Vision Impairment

Charron argues that Dr. Hogan's medical opinion, which states that she can only rarely perform work requiring depth perception, directly contradicts the ALJ's assertion that "there is no substantial medical evidence in the record establishing .

11

. . . limitations from" Charron's diagnosed amblyopia.  Doc. No. 8; Tr. at 15.  Charron notes that the ALJ included a depth perception limitation in the second hypothetical she posed to the VE, who subsequently testified that this limitation would preclude Charron from transitioning to other work in the national economy.  Despite the fact that the ALJ was clearly aware of the functional limitations noted by Dr. Hogan, Charron argues that the ALJ simply ignored them in her decision. Charron contends that the ALJ also erred in giving "great weight" to Dr. Sadler's opinion, at least in so far as it concerns her vision impairment, because Dr. Sadler did not review Dr. Hogan's treatment notes or vision questionnaire.

The Commissioner counters that Dr. Hogan's treatment notes, which report several normal findings in addition to the above noted abnormalities, do not support his assessed functional limitations.  Doc. No. 11-1.  He notes that the ALJ credited Dr. Hogan's finding that Charron's amblyopia is congenital and contends that the ALJ took Dr. Hogan's opinion into account in crafting Charron's RFC, at least to the extent that Charron "would have to avoid driving while on the job."[11]  The

---

[11] This RFC limitation is equally, if not more, likely associated with Charron's seizure impairment, which the ALJ determined was severe and which had originally caused Charron to cease driving.

12

Commissioner also highlights the fact that Dr. Hogan was an examining source, not a treating source, and thus his opinion is not entitled to controlling weight.  See 20 C.F.R. § 416.927(c)(2).

Problematically, these arguments are made in the first instance by the Commissioner, not the ALJ.  See Morse v. U.S. Soc. Sec. Admin., Comm'r, No. 12-CV-446-PB, 2013 WL 5776148, at *8 (D.N.H. Oct. 25, 2013) (citing Dube v. Astrue, No. 10-CV-179-JL, 2011 WL 742520, at *36 n.15 (D.N.H. Feb. 24, 2011)) ("The problem with the Acting Commissioner's argument is that it is not the role of the Acting Commissioner or the court to fashion a rationale under which the ALJ could have sustainably accepted [a medical] opinion.").  The ALJ's decision never so much as mentions the functional limitations in Dr. Hogan's vision questionnaire.  The decision never assesses the consistency or supportability of Dr. Hogan's opinion.  See 20 C.F.R. § 416.927(c)(3-4) (requiring an ALJ to consider these factors in determining the appropriate weight to give a medical opinion).  The ALJ never assigns a particular weight to Dr. Hogan's opinion.  See Morse, 2013 WL 5776148, at *8 (citing SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996)) ("The ALJ was obligated to

_____

See Tr. at 15.  The ALJ did not explain the basis for this limitation in her decision.

explain the weight he gave [a medical] opinion in his RFC
assessment."). In fact, the ALJ never mentions Dr. Hogan by
name.

Although the ALJ was free to make her own credibility
determination regarding Dr. Hogan's findings, she was not free
to ignore them. See 20 C.F.R. § 416.927(c) ("Regardless of its
source, we will evaluate every medical opinion we receive.");
id. § 416.927(e)(2)(ii) ("[T]he administrative law judge must
explain in the decision the weight given to . . . any opinions
from treating sources, nontreating sources, and other
nonexamining sources . . . ."); Nguyen, 172 F.3d at 35 ("The
ALJ's findings . . . are not conclusive when derived by ignoring
evidence . . . ."). Compounding this error, the ALJ also
neglected to make a credibility determination regarding
Charron's testimony at the hearing regarding her vision
impairment, or even to mention her testimony on this point at
all. See Bica v. Astrue, 2011 DNH 193, 17 ("[A]n ALJ may not
ignore relevant evidence, particularly relevant evidence that
supports the claimant's application.").

The Commissioner argues that "the mere diagnosis of an
impairment says nothing about the severity of the condition,"
specifically highlighting Charron's near perfect corrected

visual acuity in both eyes.  Nonetheless, the Commissioner ignores Dr. Hogan's assessment of the severity of Charron's vision impairment in the form of specific functional limitations supported by a number of medical signs documented in his examination.  The Commissioner further contends that Charron's activities of daily living, the numerous comments from both medical providers and the state agency physician that her vision was "grossly normal," and the relative dearth of complaints in the record regarding vision limitations constitute substantial evidence in support of the ALJ's findings.  Once again, the Commissioner misses the mark.  Although the evidence upon which the ALJ relies would likely meet the substantial evidence bar in the absence of Dr. Hogan's medical opinion, his more recent findings call the earlier evidence into doubt and warrant an explicit comparison of the competing evidence.  This is particularly true since no medical provider in the record other than Dr. Hogan conducted more than a cursory examination of Charron's eyes.  All of the vision-related comments in their treatment notes are found in a "review of systems" section that fails to include supporting explanation, and the treatment notes make clear that each provider was focused on a non-vision related complaint that Charron had presented.  Further, the

15

ALJ's decision lacks support for the proposition that Charron's activities of daily living during the alleged disability period are inconsistent with a disabling lack of depth perception.

The Commissioner is correct in noting that Dr. Hogan and Charron's other providers concur that many aspects of Charron's vision, including her visual acuity, are "grossly normal."  But only Dr. Hogan, a vision specialist and acceptable medical source, conducted an examination that was sufficiently extensive to diagnose an inner eye disorder such as amblyopia.  See 20 C.F.R. § 416.913(a)(3) (stating that licensed optometrists are acceptable medical sources that may establish the existence of a medically determinable vision impairment); id. § 416.927(c)(5) (noting that more weight is generally given to the opinions of specialists regarding issues within their field than to the opinions of non-specialists).  The only assessment of Charron's depth perception, whether positive or negative, is that of Dr. Hogan.  The ALJ was not free to ignore it.  See Nguyen, 172 F.3d at 35; Bica, 2011 DNH 193, 17.

Finally, the Commissioner argues that the ALJ was warranted in placing "great weight" on Dr. Sadler's opinion, even though he did not review Dr. Hogan's opinion, because the "subsequent evidence does not establish the presence of any greater

limitations." Doc. No. 11-1. That statement is simply untrue, and more importantly, the ALJ failed to make any such finding. Dr. Hogan's depth perception limitation was based on a new diagnosis of amblyopia of which Dr. Sadler was unaware, and this restriction certainly constitutes a "greater limitation" than anything previously apparent in the record. The cases cited by the Commissioner on this point are inapposite. Cf. Ferland v. Astrue, 2011 DNH 169, 11 (noting that an ALJ's reliance on a non-examining consultant's RFC opinion that is based on a review of an incomplete medical record may be reversible error, unless the subsequent evidence either reveals no greater limitations or is consistent with the consultant's assessment); see also Wenzel v. Astrue, 2012 DNH 117, 12 (same).

I must review the ALJ's decision and supporting reasoning on its face and refrain from speculation regarding the ALJ's underlying reasons for rejecting Dr. Hogan's medical opinion. Because I conclude that the ALJ ignored significant medical evidence regarding the functional limitations of Charron's vision impairments, I find that the ALJ's step five determination is not supported by substantial evidence. See Nguyen, 172 F.3d at 35. Although the ALJ on remand must explicitly evaluate Dr. Hogan's opinion and weigh the

17

credibility of his findings in light of the relevant regulatory factors, see 20 C.F.R. § 416.927(c), I express no opinion regarding the ultimate merits of Charron's disability claim.

### IV.   **CONCLUSION**

For the foregoing reasons, I deny the Commissioner's motion to affirm (Doc. No. 11) and grant Charron's motion to reverse or remand (Doc. No. 8).  Pursuant to sentence four of 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

November 18, 2013

cc:  Francis M. Jackson, Esq.
     T. David Plourde, Esq.